William C. Rooklidge (SBN 134483)
rooklidgew@howrey.com
Martha K. Gooding (SBN 101638)
goodingm@howrey.com
Scott B. Garner (SBN 156728)
garners@howrey.com
HOWREY LLP
4 Park Plaza, Suite 1700
Irvine, CA 92614
Telephone: (949) 721-6900
Facsimile: (949) 721-6910

Richard J. Burdge, Jr. (SBN 89504)
burdger@howrey.com
HOWREY LLP
550 S. Hope Street
Los Angeles, CA 90071
Telephone: (213) 892-1800
Facsimile: (213) 892-2300

Attorneys for Plaintiffs and Counter-Defendants
GLAXO GROUP LIMITED and
GLAXOSMITHKLINE LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| GLAXO GROUP LIMITED and GLAXOSMITHKLINE LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>GENENTECH, INC., and CITY OF HOPE,<br><br>Defendants. | Case No. CV-10-02764 MRP (FMOx)<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY COUNSEL FOR PLAINTIFFS**<br><br>Date:   June 8, 2010<br>Time:   1:30 p.m.<br>Judge:  Hon. Mariana R. Pfaelzer<br>Ctrm:   12 |
| GENENTECH, INC., and CITY OF HOPE,<br><br>Counter-Plaintiffs,<br><br>vs.<br><br>GLAXO GROUP LIMITED and GLAXOSMITHKLINE LLC,<br><br>Counter-Defendants. | |

1

**TABLE OF CONTENTS**

2   I.    QUESTIONS PRESENTED ........................................................................... 1

3   II.   INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

4   III.  BACKGROUND ......................................................................................... 3

5         A.    The Chiron Matter ........................................................................... 3

6         B.    Henry Bunsow's Lateral Move to Howrey ...................................... 5

7         C.    GSK's Hiring of Howrey ................................................................. 5

8         D.    Howrey's Ethical Screen ................................................................. 6

9   IV.   ARGUMENT .............................................................................................. 7

10        A.    There Is No Conflict To Be Imputed to the Howrey Firm. .......... 8

11              1.    The *Chiron* Matter Is Not "Substantially Related"
                        to the Current Matter. ........................................................... 9

12
                        a.    The Cabilly I Patent Was Not at Issue in the
13                               *Chiron* Trial. ............................................................. 10

14                      b.    Case Law Supports the Conclusion that,
                              Notwithstanding the Citation of Cabilly I as
15                             Prior Art in the *Chiron* Trial, the Two Cases
                              Are Not Substantially Related. ................................. 13

16
                        c.    The Cases on Which Genentech Relies
17                             Involve  Representations That Are Much
                              More Related than Those at Issue Here. .................. 16

18
                  2.    Howrey's Ethical Screen Is Sufficient To Defeat
19                       the Presumption of any Imputed Conflict. ......................... 18

20        B.    Howrey Has Not Breached a Duty of Loyalty to
                  Bunsow's Former Client, Genentech. ........................................... 20

21
          C.    Genentech Is Not Attempting To Avoid a Conflict, But
22               Rather To Prevent GSK from Hiring the Best Counsel
                  Available. ...................................................................................... 21

23
          D.    Genentech Has Not Shown That It Is Entitled to an Order
24               Precluding GSK from Using Howrey's Work Product. ................. 24

25  V.    CONCLUSION ........................................................................................ 25

26

27

28

# TABLE OF AUTHORITIES

## CASES

*Actel Corp. v. Quicklogic Corp.*,
    No. C-94 20050 JW (PVT),
    1996 U.S. Dist. LEXIS 11815 (N.D. Cal. Apr. 23, 1996) ...................24

*Adams v. Aerojet-Gen. Corp.*,
    86 Cal. App. 4th 1324 (2001) ........................................................7, 22

*Apeldyn Corp. v. Samsung Elecs. Co.*,
    No. 08-568-SLR,
    2009 WL 3149603 (D. Del. Sept. 30, 2009) ...........................14, 17, 18

*Cal Pak Delivery v. UPS*,
    52 Cal. App. 4th 1 (1997) .............................................................25

*Chiron Corp. v. Genentech, Inc.*,
    268 F. Supp. 2d 1148 (E.D. Cal. 2002) .........................................3, 4

Chiron Corp. v. Genentech, Inc.,
    363 F.3d 1247 (Fed. Cir. 2004) ....................................................4, 5

*Chiron Corp. v. Genentech, Inc.*,
    No. Civ. S-00-1252 WBS GGH,
    2002 U.S. Dist. LEXIS 19126 (E.D. Ca. June 24, 2002) .................... 3

*City and County of San Francisco v. Cobra Solutions, Inc.*,
    119 Cal. App. 4th 304 (2004) ........................................................20

*Elan Transdermal LTD. v. Cygnus Therapeutic Sys.*,
    809 F. Supp. 1383 (N.D. Cal. 1992) ...............................................11

*Evans v. Artek Sys. Corp.*,
    715 F.2d 788 (2nd Cir. 1983)..........................................................22

*First Wis. Mortgage Trust v. First Wis. Corp.*,
    584 F.2d 201 (7th Cir. 1978) .........................................................24

*Genentech, Inc. v. Sanofi-Aventis Deutschland GmbH*,
    No. C08-04909S1,
    2010 U.S. Dist. LEXIS 35867 (N.D. Cal. Mar. 20, 2010)...................16

*Global Van Lines, Inc. v. Super. Ct.*,
    144 Cal. App. 3d 483 (1983) ..........................................................10

*H. F. Ahmanson & Co. v. Salomon Bros., Inc.*,
    229 Cal. App. 3d 1445 (1991) ......................................................9, 10

*Hitachi, Ltd. V. Tatung Co.*,
    419 F. Supp. 2d 1158 (N.D. Cal. 2006) ......................................11, 17

*Hoffmann-La Roche v. Promega Corp.*,
    No. C-93-1748-VRW,
    1994 U.S. Dist. LEXIS 10174 (N.D. Cal. June 13, 1994) ...................13

1
*In re County of Los Angeles*,
    223 F.3d 990 (9th Cir. 2000) .............................................................14
2
*In re Lee G.*,
3
    1 Cal. App. 4th 17 (1991) .............................................................7, 8
4
*In re Marvel*,
    251 B.R. 869 (Bankr. N.D. Cal. 2000)............................................. 7
5
*Jessen v. Hartford Cas. Ins. Co.*,
6
    111 Cal. App. 4th 698 (2003) .............................................................10
7
*Kirk v. First Am. Title Ins. Co.*,
    183 Cal. App. 4th 776 (2010) .............................................................18
8
*Oasis W. Realty, Inc. v. Goldman*,
9
    182 Cal. App. 4th 688 (2010) .............................................................21
10
*Openwave Sys., Inc. v. 724 Solutions, Inc.*,
    No. C 09-3511 RS,
11
    2010 WL 1687825 (N.D. Cal. Apr. 22, 2010)...................................17
12
*Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*,
    760 F.2d 1045 (9th Cir. 1985) .......................................................7, 21
13
*People ex rel. Dep't of Corps. v. SpeeDee Oil Change Systems, Inc.*,
14
    20 Cal. 4th 1135 (1999).............................................................18, 19
15
*Plumley v. Doug Mockett & Co.*,
    No. CV 04-2868 GHK (Ex)
16
    2008 U.S. Dist. LEXIS 105634 (C.D. Cal. Dec. 22, 2008) ...............11
17
*Reliant Pharms., Inc. v. Par Pharm., Inc.*,
    No. 06-774-JJI,
18
    2008 U.S. Dist. LEXIS 33461 (D. Del. Apr. 23, 2008)......................14
19
*Santa Teresa Citizen Action Group v. City of San Jose*,
    114 Cal. App. 4th 689 (2003) .............................................................16
20
*Synergy Tech. Design, Inc. v. Terry*,
21
    No. 06-02073,
    2007 U.S. Dist. LEXIS 34463 (N.D. Cal. May 2, 2007) ....................22
22
*Talecris Biotherapeutics, Inc. v. Baxter Int'l, Inc.*,
23
    491 F. Supp. 2d 510 (D. Del. 2007).................................................9, 14
24
*Thorner v. Sony Computer Entm't Am., Inc.*,
    No. 09-1904 (GEB),
25
    2009 WL 4041624 (D.N.J. Nov. 20, 2009)........................................17
26
*UMG Recordings, Inc. v. MySpace, Inc.*,
    526 F. Supp. 2d 1046 (C.D. Cal. 2007)............................................. 8
27
*William H. Raley Co. v. Super. Ct.*,
28
    149 Cal. App. 3d 1042 (1983) ........................................................... 8

HOWREY LLP

-iii-

Case No. CV-10-02764 MRP (FMOx)
OPPOSITION TO DEFENDANTS' MOTION TO
DISQUALIFY COUNSEL

DM_US:23243193_6

1

## **OTHER AUTHORITIES**

2

35 U.S.C. § 146 ...................................................................................................10

3

California Rule of Professional Conduct 3-310(E).......................................... 9

4

D. Del. L.R. 83.6(d)(2) .............................................................................14

5

Fed. R. Civ. P. 26(b)(1) .............................................................................22

6

Mallen & Smith,
        LEGAL MALPRACTICE, § 17:2 at 946 (2000)................................21

7

Model Rules of Professional Conduct Rule 1.9(a) .......................................14

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **I.      QUESTIONS PRESENTED**

2         Defendants and Counter-Plaintiffs Genentech, Inc. and City of Hope

3  (collectively, "Genentech") have moved to disqualify Howrey LLP as counsel for

4  Plaintiffs and Counter-Defendants Glaxo Group Limited and GlaxoSmithKline LLC

5  (collectively, "GSK").  The question presented in Genentech's motion is whether

6  Howrey should be disqualified from representing GSK in this patent infringement

7  lawsuit (the "GSK litigation") because, in a prior lawsuit, while at a different law firm,

8  one of Howrey's current partners, Henry Bunsow, represented Genentech in a separate

9  patent infringement matter (*Chiron*) in which a parent (Cabilly I) to the patent-in-suit in

10  the GSK litigation (Cabilly II) was introduced into evidence to show the state of the art

11  at the time an application for a completely different patent (the Chiron "Ring patent")

12  was filed.  Resolution of this question requires the Court to determine whether the

13  subject matter of Bunsow's prior representation of Chiron and the GSK litigation are

14  "substantially related" and, if they are, whether Howrey can rebut the imputation of any

15  conflict from Bunsow to the entire firm through an ethical screen.

16  **II.     INTRODUCTION AND SUMMARY OF ARGUMENT**

17         Genentech's motion is no more than a tactical ploy to obtain an unfair advantage

18  in this important and complex lawsuit.  Arguing in the vaguest of terms, Genentech

19  contends that the mere fact that one of its patents, U.S. Patent No. 4,816,567 (the

20  "Cabilly I patent"), was introduced into evidence in the 2002 *Chiron v. Genentech*

21  ("*Chiron*") trial – in which Genentech was represented by Henry Bunsow, then a partner

22  with Keker & Van Nest ("Keker") – renders *Chiron* "substantially related" to the GSK

23  litigation in which the validity and infringement of a patent issuing from a continuation

24  application, U.S. Patent No. 6,331,415 (the "Cabilly II patent"), is at issue.  On this

25  basis, Genentech argues that the entire Howrey firm should be disqualified from

26  representing GSK in this litigation.

27         Contrary to Genentech's tactical argument, the two matters are not substantially

28  related because neither the Cabilly I nor the Cabilly II patent was at issue in *Chiron*.

DM_US:23243193_6

1   Rather, Cabilly I was introduced in *Chiron* merely to show that the disclosed technology
2   was publicly available in the prior art as of 1984, a fact apparent from the face of the
3   Cabilly I patent and relevant only to determine the priority date of the *Chiron* patent-in-
4   suit, U.S. 6,054,561 (the "Ring patent").  Enablement of the Cabilly I patent claims was
5   not at issue in *Chiron*, and Cabilly II – the patent-in-suit in the GSK litigation – was
6   never even mentioned in the *Chiron* trial.  Moreover the claims of the Cabilly I and II
7   patents are distinctly different, as Genentech has argued to the USPTO.  Any connection
8   between the representations is thus tenuous at best, and will not satisfy the "substantial
9   relationship" test.

10      Moreover, even if there were a conflict, it should not be imputed to the entire
11   Howrey firm because Howrey erected an adequate ethical screen, thereby eliminating
12   any measurable risk of Bunsow imparting any material confidential information from
13   *Chiron* to the GSK trial team

14      In addition, there is no reasonable argument that Bunsow breached his duty of
15   loyalty to Genentech through Howrey's representation of GSK.  The duty of loyalty
16   primarily protects only ***current*** clients in ***concurrent*** representations, and not ***former***
17   clients in ***successive*** representations – particularly where, as here, there is no evidence
18   that the law firm is attacking its own work product or actually using confidential
19   information obtained from the former client.

20      Finally, however the Court decides the issue of disqualification, there simply is
21   no basis for Genentech's draconian request that the Court bar Howrey or GSK from
22   turning over any Howrey work product to potential successor counsel.  Such an order
23   only would be appropriate if there were actual evidence that the work product was
24   tainted by the conflict – evidence which Genentech's one-line statement in its
25   conclusion does not provide.

26      For all of these reasons, GSK respectfully requests that the Court not disqualify
27   Howrey, GSK's counsel of choice.

28

1    **III.   BACKGROUND**

2        **A.   The Chiron Matter**

3          On June 7, 2000, Chiron filed suit against Genentech in the United States District

4 Court for the Eastern District of California alleging Genentech's Herceptin product

5 infringed Chiron's Ring patent. *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1148,

6 1151 (E.D. Cal. 2002).  Herceptin is a therapeutic antibody used for treatment of breast

7 cancer. *See Chiron Corp. v. Genentech, Inc.*, No. Civ. S-00-1252 WBS GGH, 2002

8 U.S. Dist. LEXIS 19126, at **6-7 (E.D. Ca. June 24, 2002).  Henry Bunsow, while with

9 the law firm of Keker & Van Nest, represented Genentech.  Declaration of Henry C.

10 Bunsow in Support of Opposition to Motion To Disqualify ("Bunsow Decl.") at ¶ 2.

11          The Ring patent claims priority *via* a series of applications filed in 1984, 1985,

12 and 1986. *Chiron*, 268 F. Supp. 2d at 1151.  After the original application was filed in

13 1984, continuation-in-part applications adding further disclosure were filed in 1985,

14 1986, and 1995.  The 1995 continuation-in-part application issued as the Ring patent,

15 broadly claiming all monoclonal antibodies that bound to a particular protein found in

16 human breast cancer. *Id.*  The sufficiency of written description and enablement of the

17 1980s applications as they relate to the claims of the Ring patent were key issues in

18 *Chiron*.

19          In *Chiron*, the court construed the claim term "monoclonal antibody" to mean

20 "any homogeneous population of antibodies, [that] is not limited by the species or

21 source of the antibodies." *Id.* at 1152.  Thus, the claims of the Ring patent "encompass

22 monoclonal antibodies derived from hybridomas, as well as 'altered,' 'hybrid,'

23 'chimeric,' and 'humanized' antibodies." *Id.*

24          Both parties filed multiple motions and cross motions for summary judgment.

25 Among the several motions, the parties cross moved on Genentech's anticipation,

26 written description, and enablement defenses addressing whether the Ring patent was

27 entitled to the benefit of the filing dates of the 1984, 1985, or 1986 applications. *Id.* at

28 1151.  The parties had stipulated that if the Ring patent was not entitled to any of those

1  three filing dates, and instead only could claim priority to the 1995 application, the

2  patent was invalid over intervening prior art. *Chiron Corp. v. Genentech, Inc.*, 363 F.3d

3  1247, 1252 (Fed. Cir. 2004). Genentech argued that none of the 1980s applications

4  sufficiently described or enabled chimeric or hybrid antibodies, as the court construed

5  the term "monoclonal antibody" to include those embodiments. *Chiron*, 268 F. Supp.

6  2d at 1156-57. Chiron responded by arguing that the priority documents did not need to

7  enable inventions developed after the application was filed, *i.e.*, hybrid and chimeric

8  monoclonal antibodies. *Id.* Accordingly, to rebut Chiron's argument, Genentech

9  needed to show that such antibodies were known before Chiron's alleged priority dates.

10  To do so, Genentech pointed to a number of publications, including the Cabilly I patent

11  – the application for which was filed in 1983 and published in 1984. *Id.* at 1157.

12      In its ruling on the parties' summary judgment motions on Genentech's defenses

13  of anticipation, written description, and enablement, the court agreed that Cabilly I

14  disclosed chimeric antibodies. *Id.* at 1157 (citing Cabilly I). Importantly, Cabilly I was

15  only one of many pieces of evidence introduced to establish the existence of chimeric

16  and hybrid antibodies in 1984. *Id.* The court's order did not discuss the enablement,

17  validity, or adequacy of description contained in Cabilly I. Ultimately, the court found

18  disputed issues of fact, and the case continued to trial.

19      At trial, Genentech again sought to demonstrate that chimeric and hybrid

20  antibodies were known in 1984, and both Chiron and Genentech elicited testimony that

21  Cabilly I disclosed hybrid and chimeric antibodies.[1]  Genentech used this testimony to

22

23

[1] Q. Does the Cabilly patent application describe how to make chimeric antibodies?

24  A. Yes, it does.
   Q. Does it describe how to make hybrid antibodies?

25  A. Yes, it does.

26  Docket No. 30-21 at Ex. J, 383:18-22. And Chiron's counsel, Ms. Krevans, cross-examined Dr. French on her critique of Chiron's expert's, Dr. Harris', opinion:

27  Q. Okay. Now, Dr. Harris has opined that chimerics were not known in the field until

28  after February of ' 84. And that is your response; right?

(Continued...)

1  support its argument that the Chiron 1984-86 applications did not enable or adequately

2  describe chimeric or hybrid antibodies as claimed in the Ring patent.  Garner Decl.,

3  Ex. B at pp. 3-5; *see also Chiron Corp.,* 363 F.3d at 1251 ("Because the first publication

4  that disclosed chimeric antibody technology did not appear until four months after this

5  filing, it is not surprising that the 1984 application does not disclose any chimeric

6  antibodies.").  There was no trial testimony on the validity, enablement, or

7  enforceability of the Cabilly I patent.

8      At no point was any evidence of the Cabilly II patent submitted during the *Chiron*

9  litigation.

10      **B.    Henry Bunsow's Lateral Move to Howrey**

11      On or about September 30, 2002, after the *Chiron* trial concluded, Bunsow moved

12  from Keker to Howrey.  Bunsow Decl. at ¶ 2.  Bunsow did not bring any *Chiron* case

13  related files, and no other members of the *Chiron* trial team moved to Howrey.  *Id.* at

14  ¶¶ 2-3.

15      **C.    GSK's Hiring of Howrey**

16      On or about January 27, 2010, GSK retained Howrey and, in particular, Lloyd

17  "Rusty" Day and his team, to represent GSK in the GSK litigation.  Day was and is one

18  of the few attorneys in the United States qualified to handle this case.  *See* Declaration

19  of Mark Rachlin in Support of Opposition to Motion To Disqualify ("Rachlin Decl."), at

20  ¶¶ 2-3; Declaration of Lloyd R. Day in Support of Opposition to Motion To Disqualify

21

22  _____

(...Continued)

23  A. He basically is saying that he doesn't dispute that the Cabilly team had discovered
    chimeric antibodies before the filing date.

24  Declaration of Scott B. Garner in Support of Opposition to Motion To Disqualify

25  ("Garner Decl."), Ex. A at 488:3-8.

26  Q. In response to that statement by Dr. Harris, you do not in this report point out any
    publication of chimeric antibodies before February 1984; correct?

27  A. That is correct.

28  *Id.* at 489:3-6.

("Day Decl."), at ¶¶ 2-3.  Day's and his team's strong track record and experience in molecular biopharmaceutical cases involving recombinantly engineered human therapeutic products, including recombinant proteins, as well as their experience enforcing and challenging patent claims – particularly in California – makes them particularly well qualified for this matter.  Rachlin Decl. at ¶ 3; Day Decl. at ¶¶ 2-3.  Henry Bunsow did not participate in any discussions internally or with GSK about the retention, he was not part of the team GSK considered, and GSK had no knowledge that Bunsow had represented Genentech.  Rachlin Decl. at ¶ 3; Day Decl. at ¶ 11.

In addition to Day's experience, GSK's choice of counsel was limited because many of the attorneys GSK had retained in the past to handle these types of matters had conflicts resulting from the Roche-Genentech merger.  Rachlin Decl. at ¶ 4.  In light of Day's expertise and the inability of many other law firms to represent GSK in a matter adverse to Genentech, it would be very difficult to replace Howrey.  Rachlin Decl. at ¶ 5.

### D.    Howrey's Ethical Screen

Howrey first learned of a potential conflict on or about March 9, 2010, when Day received a letter from Genentech's counsel stating her belief that Howrey had a conflict because Bunsow had represented Genentech in the *Chiron* case.  *See* Exhibit A to Declaration of Daralyn J. Durie filed April 27, 2010 ("Durie Decl."), at ¶ 6; Day Decl. at ¶ 4.

On or about March 10, 2010, that letter was forwarded to William O'Brien, Howrey's partner responsible for advising the firm and its lawyers on conflicts and other ethical issues.  Declaration of William R. O'Brien in Support of Opposition to Motion To Disqualify ("O'Brien Decl."), at ¶ 3.  Although it did not appear that there was a conflict, in an abundance of caution, Howrey immediately established an ethical screen separating Bunsow from all members of the GSK litigation team with respect to *Chiron* and the GSK litigation.  *Id.* at ¶¶ 5-8 (detailing the ethical screen).

1    Apart from being informed about Genentech's conflict allegations, Bunsow had

2  no communications with the GSK team regarding his representation of Genentech in

3  *Chiron*.  Bunsow Decl. at ¶ 17; Day Decl. at ¶¶ 6, 10-11.  Howrey has no documents

4  from Bunsow's representation of Genentech in the *Chiron* litigation.  Bunsow Decl. at

5  ¶¶ 3, 16; O'Brien Decl. at ¶ 9.  In fact, Bunsow (who works in Howrey's San Francisco

6  office) was unaware that GSK had become a Howrey client or that colleagues in the

7  East Palo Alto office had been engaged to handle this litigation until after Genentech's

8  counsel's letter arrived.  Bunsow Decl. at ¶ 5.  Other than his involvement in opposing

9  this motion, Bunsow has had no involvement in the GSK case, nor has he had access to

10  any of the GSK files.  *Id.* at ¶ 17.  Indeed, the GSK files are located in East Palo Alto.

11  Day Decl. at ¶ 12.  Bunsow has not attempted to access any GSK documents

12  electronically or in hard copy, and he is locked out of those files.  Bunsow at ¶ 17;

13  O'Brien Decl. at ¶ 7.

14  **IV.   ARGUMENT**

15    Based on vague and overstated descriptions of the relationship between the

16  *Chiron* matter and the GSK litigation, Defendants ask the Court to disqualify GSK's

17  counsel of choice from representing it in this important and complex case – a drastic

18  measure disfavored by both federal and state courts in California because of the

19  hardship it imposes on clients.  *See, e.g., In re Marvel*, 251 B.R. 869, 871 (Bankr. N.D.

20  Cal. 2000) ("A motion for disqualification of counsel is a drastic measure which courts

21  should hesitate to impose except when of absolute necessity.") (internal citations

22  omitted); *Adams v. Aerojet-Gen. Corp.*, 86 Cal. App. 4th 1324, 1339 (2001)

23  (recognizing "that disqualification usually imposes a substantial hardship on the

24  attorney's innocent client, who has been deprived of chosen counsel.").  These motions,

25  therefore, are subject to "particularly strict judicial scrutiny."  *Optyl Eyewear Fashion*

26  *Int'l Corp. v. Style Cos.,* 760 F.2d 1045, 1050 (9th Cir. 1985) (internal citations

27  omitted); *see also In re Lee G.*, 1 Cal. App. 4th 17, 28 (1991) ("A court confronted with

28

1    an attorney disqualification motion should proceed with caution in order to avoid
2    hardships on innocent clients . . . .").

3          Moreover, rather than automatically order disqualification whenever a moving
4    party can point to some overlap – no matter how tangential – between a former
5    representation and a current representation, courts instead perform a "delicate balancing
6    process" to determine whether the drastic remedy of disqualification is warranted:

7               The court must weigh the combined effect of a party's right to
8               counsel of choice, an attorney's interest in representing a client, the
9               financial burden on a client of replacing disqualified counsel and any
10              tactical abuse underlying a disqualification proceeding against the
11              fundamental principle that the fair resolution of disputes within our
12              adversary system requires vigorous representation of parties by
13              independent counsel unencumbered by conflicts of interest.

14   *In re Lee G.*, 1 Cal. App. 4th at 26, quoting *William H. Raley Co. v. Super. Ct.*, 149 Cal.
15   App. 3d 1042, 1048 (1983)[2] (internal quotations omitted).

16         **A.    There Is No Conflict To Be Imputed to the Howrey Firm.**

17          Largely ignoring the balancing test described in case law, Genentech erroneously
18   argues that Howrey is barred from representing GSK because one of its partners, Henry
19   Bunsow, represented Genentech eight years ago in *Chiron*, in which evidence of a
20   different patent, the Cabilly I patent, briefly was presented at trial.  This relationship,
21   Genentech insists, means that the representations are "substantially related," thereby
22   barring Howrey's representation in the GSK litigation.  As explained below, this
23   tangential relationship does not satisfy California's "substantial relationship" test.

24   _____

25   [2] *See also UMG Recordings, Inc. v. MySpace, Inc.*, 526 F. Supp. 2d 1046, 1063 (C.D.
     Cal. 2007) (In refusing to disqualify counsel despite acknowledging a substantial
26   relationship between successive representations, the court noted that client confidences
     can be protected by less drastic measures than disqualification – such as "protective
27   orders, limiting the admission of evidence; in camera proceedings; the use of sealed
     records; payment of attorney fees and costs; and disciplinary actions through the State
28   Bar of California in appropriate circumstances.").

1    **1.    The *Chiron* Matter Is Not "Substantially Related" to the**

2    **Current Matter.**

3    Because Genentech is a ***former*** client of Bunsow, California Rule of Professional

4    Conduct 3-310(E) is used to determine whether Howrey's representation is

5    impermissibly adverse to Genentech.  Rule 3-310(E) provides:

6    A member shall not, without the informed written consent of the

7    client or former client, accept employment adverse to the client or

8    former client where, by reason of the representation of the client or

9    former client, the member has obtained confidential information

10    material to the employment.

11    Cal. R. Prof'l Conduct 3-310(E).  Per the rule, it is not enough that Bunsow may have

12    obtained confidential information from Genentech during *Chiron*; this information must

13    be ***material*** to the GSK litigation.

14    To make this determination, California courts apply the "substantial relationship"

15    standard.  *See, e.g., H. F. Ahmanson & Co. v. Salomon Bros., Inc.*, 229 Cal. App. 3d

16    1445, 1454 (1991) ("[T]he rule followed in California is that the attorney's possession

17    of confidential information will be presumed only when a substantial relationship has

18    been shown to exist between the former representation and the current

19    representation, . . ." (internal quotation omitted).  Thus, only information that is

20    material to the former representation will be presumed to be in the attorney's

21    possession.  *See id.* at 1452 n.2 ("The Court will assume that during the course of the

22    former representation confidences were disclosed to the attorney ***bearing on the subject***

23    ***matter of the representation***.") (emphasis added); *see also Talecris Biotherapeutics,*

24    *Inc. v. Baxter Int'l, Inc.*, 491 F. Supp. 2d 510, 515 (D. Del. 2007) ("[T]he court should

25    not allow its imagination to run free with a view to hypothesizing conceivable but

26    unlikely situations in which confidential information 'might' have been disclosed which

27    would be relevant to the present suit.") (internal quotation omitted).

28

1    Moreover, in determining whether a substantial relationship exists between two

2   successive representations, courts are not to apply a mechanical test; rather courts look

3   at the "practical consequences of the attorney's representation of the former client."

4   *H. F. Ahmanson,* 229 Cal. App. at 1454, citing *Global Van Lines, Inc. v. Super. Ct.*, 144

5   Cal. App. 3d 483, 489 (1983).  Put differently, "the relevant legal principles are only

6   generally stated and must be applied to individual cases by the exercise of the court's

7   considered judgment based in reason, logic and common sense." *Jessen v. Hartford*

8   *Cas. Ins. Co.*, 111 Cal. App. 4th 698, 713-14 (2003).  Examining the "practical

9   consequences" in this case, and applying "reason, logic and common sense," it becomes

10  obvious that it is highly unlikely that Bunsow would have any material confidential

11  information about Cabilly I or Cabilly II, or any other Genentech patent or product – let

12  alone that he could or would disclose it to the GSK litigation team.  It is not sufficient

13  for Genentech to conclusively state that Bunsow learned confidential information from

14  prior representation of Genentech in the *Chiron* matter without providing further

15  information about why this information is material to the GSK litigation.  Unless

16  Genentech can show that the two matters are substantially related, the mere possession

17  of confidential information from a previous representation does not warrant

18  disqualification.

19           **a.     The Cabilly I Patent Was Not at Issue in the *Chiron* Trial.**

20    As an initial matter, the patent at issue in the GSK litigation is Cabilly II.  At no

21  time during the *Chiron* trial was Cabilly II mentioned, let alone directly at issue.  Thus,

22  it cannot be presumed for purposes of this motion that Bunsow or the other members of

23  the Keker trial team learned any confidential information about Cabilly II because it was

24  never at issue in *Chiron*, and, consequently, was not within the scope of confidential

25  information they would have acquired.[3]  *See H. F. Ahmanson*, 229 Cal. App. 3d at 1454

26  _____

27  [3] Genentech argues that, at the time Chiron filed its suit, Genentech was litigating a civil
    action under 35 U.S.C. § 146 to obtain relief from an adverse decision of the PTO

28  regarding Cabilly II.  Mot. at 3.  It then contends that "Bunsow also is presumed to have

(Continued...)

1  (finding substantial relationship "when it appears by virtue of the nature of the former

2  representation or the relationship of the attorney to his former client confidential

3  information material to the current dispute would normally have been imparted to the

4  attorney . . .").

5       Case law also does not support Genentech's strained effort to relate the two

6  actions.  Based on the cases reviewed by counsel for this Opposition, most patent cases

7  in which a substantial relationship has been found involve the same patent-in-suit in

8  both representations.  Those cases simply are not applicable here, as Cabilly II was not

9  at issue, or even mentioned, in the *Chiron* case.  *See, e.g., Elan Transdermal LTD. v.*

10  *Cygnus Therapeutic Sys.*, 809 F. Supp. 1383, 1385 (N.D. Cal. 1992) (in prior

11  representation of defendant, plaintiff's counsel had provided "oral and written advice

12  regarding the '853 patent, the very patent-in-suit, . . .") (cited in Genentech's Mot. at

13  10);[4] *Hitachi, Ltd. v. Tatung Co.*, 419 F. Supp. 2d 1158, 1159 (N.D. Cal. 2006)

14  (successive representations both involving the same three patents-in-suit) (cited in Mot.

15  at 10); *see also Plumley v. Doug Mockett & Co.*, No. CV 04-2868 GHK (Ex) 2008 U.S.

16  Dist. LEXIS 105634, *5 (C.D. Cal. Dec. 22, 2008) (finding substantial relationship

17  when both representations involved "the same Plaintiff and same Defendant litigating

18  over the same patent").

19       As stated in its motion, Genentech's only link between the two representations is

20  that Cabilly I was mentioned in *Chiron* and Cabilly II is at issue in this GSK litigation.

21

22  (...Continued)
    acquired information regarding Genentech's desire to ensure that its *Chiron* defense

23  strategy did not conflict with its positions in the Section 146 action and did not impair
    its ability to enforce Cabilly II."  Mot. at 9.  But it certainly can***not*** be presumed that

24  Bunsow obtained confidential information about the Section 146 action he was not
    retained to handle, nor about how that Section 146 action might impact Cabilly II.  Such

25  information would not have been material to the Ring patent infringement case he was
    hired to handle.  Absent the presumption, Genentech's argument that Bunsow learned

26  confidential information related to the Section 146 action or Cabilly II is pure
    speculation.

27  [4] Moreover, in *Elan*, patentee's counsel conceded that there was a substantial
    relationship; the issue was whether the conflict should be imputed to the entire firm. 809

28  F. Supp. at 1389.

1   In an effort to inflate its importance, Genentech describes the use of Cabilly I in vague,

2   high-level language that suggests – inaccurately – that Cabilly I was at the center of

3   *Chiron*, and that Bunsow and the Keker team argued the validity of that patent to the

4   court.[5]  However, in order to determine whether the *Chiron* matter was substantially

5   related to the instant matter, the court needs to understand precisely what use was made

6   of the Cabilly I patent in the *Chiron* trial – not in vague generalities, but in exact terms.

7   That Genentech never actually describes this in its motion speaks volumes.

8          At the *Chiron* trial, Genentech introduced Cabilly I as evidence that chimeric

9   antibodies were known in the art in the mid-1980s.  It further was introduced as an

10  example of a description of a method to make chimeric antibodies.  The evidence used

11  were the disclosures contained in the published Cabilly I patent itself, evident from the

12  face of the patent, and not any confidential or non-public information; nor was any

13  confidential assessment necessary regarding its validity or enforceability.  Indeed,

14  because Cabilly I was used to show the state of prior art, it necessarily required only the

15  use of publicly available information – otherwise, it would not have constituted

16  evidence of what was known in the art at the time of filing.  At no time did either party

17  raise the issue of or ask the court to rule on the enablement or validity of the Cabilly I

18  patent; those issues were reserved for the Ring patent, which of course is a different

19  patent with very different claims and specifications.

20         Moreover, Genentech's attempt to link the two litigations through Herceptin, the

21  accused product in *Chiron*, also fails to demonstrate the two matters are "substantially

22

23  ──────────────

24  [5] For example, Genentech argues that the instant case is substantially related to the
    *Chiron* matter because "each case raises written description and enablement issues to
    which the Cabilly patents are material."  Mot. at 8.  That one or more of the Cabilly
25  patents are or were "material" to a Section 112 analysis of the Ring patent at issue in the
    *Chiron* matter is unremarkable.  Any number of other patents and art are "material" to
26  such a Section 112 analysis.  That does not mean, however, that any of these other
    patents or pieces of evidence were directly at issue in, or even particularly significant to,
27  the *Chiron* trial.  Moreover, the issues of written description and enablement in *Chiron*
    were directed to the Ring patent claims and disclosure, and are completely different
28  from the issues of written description and enablement of the Cabilly II patent.

1  related." Genentech contends that evidence of Herceptin sales *could be* used in the

2  GSK litigation as evidence of commercial success. Mot. at 9. Any information that

3  Bunsow or the Keker team might have obtained pertaining to Herceptin sales from

4  *Chiron* in 2002, however, likely would be public, and certainly would be so outdated

5  and incomplete as to have little or no relevance to the GSK litigation. Other products

6  licensed under the Cabilly II patent would be far more relevant than Herceptin. Bunsow

7  can have no confidential knowledge of this later information, and, thus, there is little, if

8  any, correlation between the two suits *via* Herceptin.

9      On these facts, the "practical consequences" of Howrey's representation of GSK

10  leads to the conclusion that there is no substantial relationship, and that disqualification

11  is not warranted. A similar conclusion has been reached by noted patent ethicist

12  Professor David Hricik, whose detailed declaration is submitted concurrently with this

13  Opposition. *See* Declaration of Professor David C. Hricik in Support of Opposition to

14  Motion To Disqualify.

15          **b.    Case Law Supports the Conclusion that, Notwithstanding**

16                  **the Citation of Cabilly I as Prior Art in the *Chiron* Trial,**

17                  **the Two Cases Are Not Substantially Related.**

18      California case law, as well as case law from other jurisdictions, refutes

19  Genentech's contention that the mere citation of a patent as prior art in a previous case

20  makes a subsequent litigation involving that patent substantially related to the previous

21  case. Each case must be examined on its specific facts, and courts are loath to employ

22  the blanket, generalized rule that Genentech seeks.

23      For example, in *Hoffmann-La Roche v. Promega Corp.*, No. C-93-1748-VRW,

24  1994 U.S. Dist. LEXIS 10174 (N.D. Cal. June 13, 1994), the court denied a motion to

25  disqualify a patent holder's law firm that previously received confidential information

26  from an adverse licensee. The licensee claimed that because the technology at issue in

27  the prior representation could be enhanced with the technology in the subsequent

28

1  litigation, the two representations were substantially related.  The court rejected this

2  argument and found no substantial relationship.  *Id.* at *49.

3      Similar holdings can be found in cases from other jurisdictions, including the

4  United States District Court of Delaware.[6]  In *Reliant Pharms., Inc. v. Par Pharm., Inc.*,

5  No. 06-774-JJI, 2008 U.S. Dist. LEXIS 33461 (D. Del. Apr. 23, 2008), the law firm

6  representing defendant in a patent infringement action previously represented plaintiff

7  when it acquired the same patent.  Although plaintiff argued that its former law firm had

8  advised it "concerning the nature, scope, potential infringement, design around and

9  validity" of the patent, the court declined to find a substantial relationship between the

10  two representations.  *Id.* at *8.  In denying the motion to disqualify, the court stated that

11  the prior representation was "unlikely to have resulted in the disclosure of relevant

12  confidences that would be detrimental to [plaintiff] in the litigation of this action."  *Id.*

13  at *13.

14      In an even closer set of facts, the court in *Talecris Biotherapeutics* declined to

15  find a substantial relationship between two representations when the former

16  representation centered around a patent that was invalidating prior art to the patent at

17  issue in the current representation.  491 F. Supp. 2d 510.  Plaintiff moved to disqualify

18  defendants' counsel, Townsend and Townsend and Crew ("Townsend"), because it

19  previously had been adverse to plaintiff's co-counterclaim defendant, Bayer Healthcare.

20  The prior litigation concerned Bayer's Tenold patent, while the current litigation

21

22

23  [6] Delaware follows the ABA Model Rules of Professional Conduct.  D. Del.
    L.R. 83.6(d)(2).  Model Rule 1.9(a) provides:
24      A lawyer who has formerly represented a client in a matter shall not thereafter
        represent another person in the same or a substantially related matter in which that
25      person's interests are materially adverse to the interests of the former client unless
        the former client gives informed consent, confirmed in writing.
26  Model Rules of Prof'l Conduct 1.9(a).  In the absence of clear California authority,
    California courts may look to the Model Rules for guidance.  *See In re County of Los*
27  *Angeles*, 223 F.3d 990, 997 (9th Cir. 2000).  Indeed, Genentech itself cites authority
    from Delaware in support of its motion.  *See* citation to *Apeldyn Corp. v. Samsung*
28  *Elecs. Co.,* No. 08-568-SLR, 2009 WL 3149603 (D. Del. Sept. 30, 2009)  (Mot. at 11).

1    concerned the '191 patent.  Among its defenses, Baxter asserted that the '191 patent was

2    obvious in view of the Tenold patent.

3        Despite acknowledging that the '191 patent listed on its face the Tenold patent,

4    and that Baxter contended in the current case that the Tenold patent was invalidating

5    prior art to the '191 patent, the court found there was no substantial relationship

6    between the prior representation and the current representation, even though "[t]here is

7    no doubt that the two litigations overlap to some degree." *Id.* at 515.  The court

8    admonished against artificially creating connections between two matters.  *Id.* at 515.[7]

9        In language strikingly similar to the position GSK asks the Court to take in this

10   case, the *Talecris* court also found:

11           Given that it is the validity of the '191 patent, and not the validity of

12           the Tenold patent, that is at issue in the present litigation, any

13           confidential information Townsend might have learned about the

14           Tenold patent during its brief re presentation of Miles is not relevant

15           to the validity of the '191 patent.  The court thus finds that the

16           substantive relationship between the two litigations is tenuous.

17   *Id.*  Here, too, as explained above, any relationship between Bunsow's representation of

18   Genentech in *Chiron* and Howrey's representation of GSK in the GSK litigation is

19   tenuous.  Moreover, any confidential information Bunsow or the Keker trial team may

20   have received in the *Chiron* representation is not likely to be material to the validity of

21   the Cabilly II patent – the only patent at issue in the GSK litigation.

22        Finally, Genentech cannot save its motion by arguing that the general subject

23   matters of technology disclosed in the Cabilly II patent and the Ring patent are similar,

24   thereby making them substantially related.  It simply is not sufficient that the two

25

26

---

27   [7] Furthermore, the court acknowledged that "the relevance of the Tenold patent is
     evident from the face of the '191 patent and its prosecution history.  As such, it cannot
28   be reasonably inferred that Baxter's reliance on the Tenold patent is a result of
     [Townsend's] involvement in the prior litigation." *Id.* at 515.

1  matters involved the same general subject matter.  *See Santa Teresa Citizen Action*
2  *Group v. City of San Jose*, 114 Cal. App. 4th 689, 711 (2003).

3          c.      **The Cases on Which Genentech Relies Involve**
4                  **Representations That Are Much More Related than Those**
5                  **at Issue Here.**

6          Genentech cites a number of fact-specific cases in which courts determined
7  successive representations were substantially related.  But those cases are
8  distinguishable: they involved significant use of the patent-in-suit or confidential
9  information in the earlier proceeding, where the patent-in-suit or confidential
10 information became directly at issue in the later representation.

11         For example, Genentech cites *Genentech, Inc. v. Sanofi-Aventis Deutschland*
12 *GmbH*, No. C08-04909S1, 2010 U.S. Dist. LEXIS 35867 (N.D. Cal. Mar. 20, 2010), a
13 case recently decided in favor of Genentech on yet another of its motions to disqualify
14 counsel.  In that case, however, the prior matter was an interference proceeding in which
15 Genentech's lawyers received confidential inventor information that was central to the
16 first-inventorship issue in the interference action and to nonobviousness and licensing
17 issues in the subsequent infringement action.  In the interference action, Genentech's
18 counsel had used the confidential information to demonstrate diligent reduction to
19 practice to claim inventorship rights.  In the later suit against Genentech, that same
20 information would have been used as evidence of unexpected results to support
21 Genentech's nonobviousness position.

22         Here, by contrast, there is no indication that any confidential information Bunsow
23 or the Keker firm may have received, or are presumed to have received, in *Chiron* will
24 be central – or even material at all – in the GSK litigation.  Indeed, as explained above,
25 the only use Bunsow and his Keker trial team made of the Cabilly I patent was to show
26 through ***public documents*** that the art described in those patents was known at a certain
27 time.  There was no analysis of the Cabilly I patent beyond that; it simply was not
28 central to *Chiron*.

Genentech also relies on *Hitachi,* 419 F. Supp. 2d 1158 (Mot. at 10), arguing that, as in *Hitachi*, the defenses it plans to assert in the instant case are similar to the defenses it asserted in *Chiron*.  In *Hitachi*, however, the patents at issue in the prior action were the ***same three patents*** at issue in the current action.  That obviously is a very different case than the one here – so much so that, in *Hitachi*, "substantial relationship" was not even at issue.  Indeed, the court referred to the two cases as being "nearly identical."  *Id.* at 1164.  The issue was whether the imputed conflict arising from that substantial relationship could be overcome by an ethical screen.  Thus, *Hitachi* is not at all instructive on the issue of whether the Court should find a substantial relationship in this case.

Other cases cited by Genentech are similarly distinguishable, as the facts in those cases simply are not close enough to the facts in the instant case.  In particular, in none of those other cases was the confidential information allegedly obtained in the prior matter so tenuously related to the issues in the current matter, as it is here.[8]

----

[8] Genentech also cites *Openwave Sys., Inc. v. 724 Solutions, Inc.*, No. C 09-3511 RS, 2010 WL 1687825 (N.D. Cal. Apr. 22, 2010), *Thorner v. Sony Computer Entm't Am., Inc.*, No. 09-1904 (GEB), 2009 WL 4041624 (D.N.J. Nov. 20, 2009), and *Apeldyn Corp. v. Samsung Elecs. Co.*, 660 F. Supp. 2d 557 (D. Del. 2009), to support its allegation that the two matters are substantially related.  Mot. at 10-11.  However, closer examination of these cases reveals that Genentech has overstated their holdings and their applicability to this case.
- Genentech cites *Openwave* and alleges that a substantial relationship was found based on a "patent that cited as prior art U.S. counterpart of Australian application the firm had opposed nine years earlier."  Mot. at 10-11.  In *Openwave*, the U.S. counterpart to the Australian application formed the basis of an obviousness rejection of some claims of one of the patents-in-suit during its prosecution.  *Openwave* at *4.  The court noted that "it appears likely that '724 will rely on [the Australian application] to support an invalidity argument in this action."  *Id.*  There is no such relation here, as the *Chiron* litigation only referred to the existence of the Cabilly I patent, and made no assessment as to its validity.  Thus, there is not the same concern here that there was in *Openwave;* GSK will not be able to use previous assessments regarding the validity of Cabilly I in this suit regarding Cabilly II.
- In *Thorner* (cited in Mot. at 11), the court sought to determine whether the same lawyer that had previously represented Sony in prosecution matters later could argue that Sony infringed patents related to the same type of technology, noting that the attorney "was involved in the prosecution of patents involving technology that is related to [the patents at issue.]".  *Thorner*, 2009 WL 4041624 at *8.  Moreover, during the prior representation, the same attorney was part of a firm

(Continued...)

1    **2.    Howrey's Ethical Screen Is Sufficient To Defeat the Presumption**

2    **of any Imputed Conflict.**

3    If the Court were to find that Bunsow's relationship with Genentech created an

4    impermissible conflict, such conflict need not be imputed to Howrey because of the

5    ethical screen that Howrey erected.  This screen ensures that Bunsow neither talks to the

6    GSK litigation team nor obtains paper or electronic information from them relating to

7    the instant litigation, thereby eliminating any risk that Bunsow would impart material

8    confidential information to the GSK team.  O'Brien Decl. at ¶¶ 5-8.  Howrey put this

9    ethical screen in place as soon as it learned of the alleged conflict.[9]  *Id.* at ¶¶ 4-5.

10   Genentech mischaracterizes California law when it argues that a law firm cannot

11   rebut the presumption of an imputed conflict through an ethical screen.[10]  *Kirk v. First*

12   _____

(...Continued)

13       that litigated a case deemed "at the center of Plaintiffs' allegations in the instant
    matter," having "access (even informally) to additional information related to the

14       instant action." *Id.* at *2.  By contrast, Bunsow has had no involvement in the
    representation of GSK, has been screened from this matter, and there is no

15       evidence that he had any access to materials relevant to the validity of Cabilly II.

  •  In *Apeldyn*, disqualification was sought based on an attorney's personal

16       participation in patent infringement litigation against a former client. The attorney
    had formulated claim construction and invalidity positions, and the former client

17       argued that his new client "will necessarily be using [material] of the same type,
    if not the same, as those collected and reviewed by [the attorney] . . . ." *Apeldyn*,

18       660 F. Supp. 2d at 560.  Aside from the fact that the court found a "substantial
    relationship" with no analysis (so it is impossible to tell the basis for that

19       holding), there has been no such showing by Genentech that GSK will use
    materials from *Chiron* in an effort to invalidate Cabilly II or to support its

20       allegations in this case.  Indeed, no such materials ever were generated because
    the validity of Cabilly II (or its parent, Cabilly I) was never questioned.

21   [9] Genentech points out that Howrey only set up the ethical screen after it received a
letter from Genentech's counsel raising the specter of disqualification. Mot. at 15.  It

22   then argues that *Kirk v. First American Title Insurance Company*, 183 Cal. App. 4th
776, 791-92 (2010) (explained further below), states that a screen should be erected as

23   soon as a side-switching lawyer moves to his or her new firm.  Here, however, Howrey
had no reason to believe a conflict existed before receiving Genentech's counsel's letter;

24   thus, there would have been no reason to set up a screen earlier.  Moreover, unlike in
*Kirk*, this is not a case where Bunsow joined Howrey while a substantially related case

25   already was pending at Howrey, thereby making the need to set up a screen obvious and
immediate.  Nor is it a case where Howrey represented a party, GSK, for years while

26   leaving the allegedly tainted lawyer unscreened.

[10] Before April 2010, no reported cases in California expressly allowed a firm to avoid

27   imputation of a private lawyer's conflict to the entire firm through an ethical screen.  A
number of cases, however, ***suggested*** that it could be done. *See, e.g., People ex rel.*

28   *Dep't of Corps. v. SpeeDee Oil Change Systems, Inc.*, 20 Cal. 4th 1135, 1151-52 (1999)
(Continued...)

Case No. CV-10-02764 MRP (FMOx)
OPPOSITION TO DEFENDANTS' MOTION TO
DISQUALIFY COUNSEL

1  *American Title Insurance Company*, 183 Cal. App. 4th 776 (2010), however, recently

2  held that, in the right circumstances, the presumption of an imputed conflict can be

3  rebutted by adequately screening a lawyer from those at the firm representing an

4  adverse party. *Id.* at 810.  To establish an effective screen, the following two elements

5  are necessary: timely imposition of the screen, and "the imposition of *preventive*

6  *measures* to guarantee that information will not be conveyed." *Id.*  Howrey's

7  establishment of a screen at the first opportunity after it learned that a conflict was even

8  possible satisfies the first element.  The specific steps Howrey took, as described in the

9  accompanying Declaration of Bill O'Brien, satisfy the second element.

10      What is particularly important to note about *Kirk* is that, in the end, the court did

11  not determine whether the specific screen before it was or was not adequate.  Rather, the

12  court stated that each instance warranted "a case-by-case inquiry focusing on whether

13  the court is satisfied that the tainted attorney has not had and will not have any improper

14  communications with others at the firm concerning the litigation." *Id.* at 810-11.  Here,

15  when combined with the practical reality that Bunsow is unlikely to have any

16  confidential information in the first place that is in any way material to the GSK

17  litigation, the screen set up by Howrey effectively assures that Bunsow will not have

18  any "improper communications with others at the firm" that would in any way risk

19  imparting Genentech's confidential information to the GSK litigation team.  Thus, under

20  the case-by-case analysis mandated by *Kirk*, Howrey successfully rebuts the

21  presumption of an imputed conflict.[11]

22  _____

23  (...Continued)
    ("The declarations the Shapiro firm submitted fail to demonstrate that any formal
    screening procedure prevented attorneys working on respondents' behalf from being

24  exposed to Mobil's confidences.").  Thus, while the Supreme Court in *SpeeDee Oil* did
    not allow a screen to avoid the imputed conflict on the facts in that case, it suggested

25  that, in the right circumstances, screening could successfully rebut the presumption of
    an imputed conflict.

26  [11] Genentech points out the specific facts in *Kirk* that arguably made that an easy case.
    Mot. at 14.  Nevertheless, the lesson of *Kirk* is not that the specific facts present there

27  are necessary in every case to allow a screen to work, but rather that courts must
    perform a case-by-case analysis to determine whether the ethical screen at issue

28  sufficiently reduces any potential risk.

1    In an effort to nullify Howrey's acceptable ethical screen, Genentech argues that
2   "the California State Board of Governors recently declined to propose even a rule that
3   would allow screening of attorneys . . . ." Mot. at 13.  Genentech's argument is both
4   misleading and improper.  First, the Board of Governors has not completed its decision
5   on these rules.  It recently held more public hearings and will be sending out revised
6   rules for comment before it makes its final decisions, which are likely to come over the
7   summer.  Thus far, the Board of Governors has not taken a position for or against
8   screening.  Nobody – including Genentech – knows what the Rules Revision
9   Commission eventually will circulate for public comment, what it ultimately will
10  propose to the Board of Governors, what the Board of Governors will submit to the
11  Supreme Court, and what the Supreme Court will enact.  Accordingly, any argument
12  based on the current status of the proposed rules is premised on rank speculation.

13       **B.**     **Howrey Has Not Breached a Duty of Loyalty to Bunsow's Former**
14                **Client, Genentech.**

15       Genentech argues in passing that Howrey's current representation of GSK would
16  be a breach of Bunsow's duty of loyalty to Genentech.  To this end, Genentech asserts
17  that Howrey's representation of GSK somehow "attacks" Bunsow's previous work and
18  "betrays" his former obligations.  Mot. at 12-13.  Genentech's argument is premised on
19  two fundamental misconceptions.

20       First, the duty of loyalty generally is not implicated in successive representation
21  cases.  Breach of the duty of loyalty usually applies to concurrent representations, when
22  the lawyer attempts to represent two clients with adverse interests at the same time, and
23  the duty to represent one client zealously may conflict with the duty to represent the
24  other client zealously.  "Successive representation of clients with adverse interests raises
25  slightly different ethical concerns," and the "chief fiduciary value jeopardized is that of
26  client confidentiality, not loyalty."  *City and County of San Francisco v. Cobra*
27  *Solutions, Inc.*, 119 Cal. App. 4th 304, 311, 306 (2004) (internal citations omitted); *see*
28  *also* Mallen & Smith, LEGAL MALPRACTICE, § 17:2 at 946 (2000) ("[w]here the

1   issue involves successive client interests, the primary concern is confidentiality but

2   where concurrent client interests are involved, the primary concern is loyalty.”).

3   Indeed, recent California authority acknowledges that attorneys may take positions

4   adverse to former clients, as long as current representations are not compromised and

5   there is no threat that material confidential information is disclosed.  *See, e.g., Oasis W.*

6   *Realty, Inc. v. Goldman*, 182 Cal. App. 4th 688, 703 (2010) (“[A] lawyer may take

7   positions adverse to a client, as long as current representation is not compromised,

8   something which does not concern us, and as long as confidentiality is not

9   compromised.”).  Because there is no threat that any **current** representation of

10  Genentech is being compromised by Howrey’s representation of GSK in this matter, the

11  duty of loyalty simply is not implicated.

12          Second, Genentech’s argument is based on the erroneous proposition that Howrey

13  is somehow attacking Bunsow’s and the Keker firm’s work in *Chiron*.  As detailed

14  above, the only tangential link between the claims in *Chiron* and the claims in the GSK

15  litigation is the fact that the parent of Cabilly II was used as evidence of prior art in the

16  field existing before the Ring patent application.  Neither the validity nor the scope of

17  either Cabilly patent was litigated by the Keker firm in *Chiron*, and attacking the

18  validity of the Cabilly II patent in this case will in no way undermine the previous

19  representation of Genentech.  Genentech not only has provided no evidence or detail

20  showing how Howrey is attacking Bunsow’s work in this litigation, it also has not

21  credibly shown how Howrey could use Bunsow’s former representation of Genentech to

22  its advantage in the GSK litigation.  Without such a showing, Genentech cannot prove

23  that Bunsow has breached any duty of loyalty.

24          **C.      Genentech Is Not Attempting To Avoid a Conflict, But Rather To**

25          **Prevent GSK from Hiring the Best Counsel Available.**

26          Many courts point out the increasing frequency of “tactical” motions to disqualify

27  and strongly caution against such motions.  *See Optyl Eyewear*, 760 F.2d at 1050

28  (finding disqualification motion brought in bad faith); *Synergy Tech. Design, Inc. v.*

1   *Terry*, No. 06-02073, 2007 U.S. Dist. LEXIS 34463, at *18 (N.D. Cal. May 2, 2007),

2   citing *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2nd Cir. 1983) (observing that

3   courts require a particularly high standard of proof for disqualification based upon

4   former representation); *Aerojet-Gen. Corp.*, 86 Cal. App. 4th at 1339 ("[I]t is widely

5   understood by judges that attorneys now commonly use disqualification motions for

6   purely strategic purposes . . . ."). Genentech's tactics smack of such improper motives.

7       For instance, Genentech refers in its moving papers to a discovery request in a

8   separate action, *Centocor Ortho Biotech, Inc. v. Genentech, Inc. and City of Hope*, Case

9   No. 2:08-cv-03573. Mot. at 6. In that case, Centocor, a defendant accused of infringing

10   the Cabilly II patent, sought discovery of certain expert reports from the *Chiron*

11   litigation. Genentech suggests that Centocor's request for these reports proves that the

12   reports and, consequently, any analysis of the Ring patent are relevant to any litigation

13   over Cabilly II, including the instant one. As an initial matter, the fact that another party

14   in another action sought Genentech's expert reports in that separate matter says nothing

15   about whether *Chiron* is substantially related to ***this*** matter. Moreover, because the

16   threshold for obtaining discovery is far lower than the test for relevance and

17   admissibility, *see* Fed. R. Civ. P. 26(b)(1), whether or not a defendant's request in

18   another case was proper in the discovery context of that case also says nothing of

19   relevance here.

20       More significant, however, is the response that Genentech gave to that discovery

21   request before it decided to file this motion to disqualify. In December 2009, in a meet

22   and confer letter regarding the discovery request that Genentech now invokes to bolster

23   its disqualification motion, Genentech's counsel made clear that Genentech considered

24   the "pleadings, transcripts, and exhibits" from *Chiron* "irrelevant" to the Centocor case.

25   Garner Decl., Ex. D at p. 2. This constitutes an admission by Genentech that the issues

26   litigated in *Chiron* are not relevant to the Centocor litigation and, by extension, the GSK

27   litigation, and certainly are not "substantially related" to either case. Notwithstanding

28   this admission, Genentech now reverses course and argues that these same "irrelevant"

1  documents prove a "substantial relationship" between *Chiron* and the GSK litigation.

2  Mot. at 6.  This about-face by Genentech demonstrates that litigation tactics, and not

3  genuine fear of the disclosure of confidential information, are the impetus for this

4  motion.

5      This discovery dispute is not the only place where Genentech took a position

6  diametrically opposed to the position it is taking here.  During the *ex parte*

7  reexamination of the Cabilly II patent, Genentech responded to a PTO office action that

8  rejected claims for "obviousness-type" double patenting over the claims of Cabilly I by

9  distinguishing the claims of the two patents.  Garner Decl., Ex. C at pp. 16-17.  Indeed,

10 Genentech distinguished the two patents on at least three grounds and even included a

11 chart to explain to the examiner in detail the relevant differences between Cabilly I and

12 Cabilly II.  *Id.* at 17 & Ex. A.  Genentech insisted that "[e]ach of these distinctions

13 would have been appreciated by a person of ordinary skill in the art in early April of

14 1983 as being significant, . . ."  *Id.* at 17.  But now Genentech sings a different tune,

15 downplaying and ignoring the differences between Cabilly I and Cabilly II.

16 Genentech's inconsistent positions underscores that this motion is about strategy and

17 gaining an unfair, tactical advantage.

18     In addition, Genentech's initial discussion with Howrey preceding this motion

19 further reveals Genentech's tactical motives for this motion.  In that discussion,

20 Genentech's counsel inquired whether Howrey thought an ethical screen would be

21 sufficient in this case, and then asked whether GSK would insist that the law firm of

22 Irell & Manella was conflicted from representing City of Hope in this matter due to

23 Irell's representation of GSK in another matter.  Day Decl. at ¶ 8.  Apparently,

24 Genentech's counsel was more concerned about reaching an understanding that would

25 allow Irell to represent City of Hope than it was in protecting Genentech from any

26 claimed fear of the disclosure of confidential information by Bunsow.  Genentech's

27 counsel's attempt to "horse trade" suggests something other than legitimate concern

28 over a conflict of interest.

1    That Genentech is motivated to get Howrey disqualified from this case is not
2    surprising.  Howrey, and specifically the litigation team led by Rusty Day, is
3    internationally renowned for its experience, expertise, and results in patent litigation
4    involving recombinant protein therapeutics.  *See* Rachlin Decl. at ¶ 3; Day Decl. at ¶ 42.
5    Moreover, through prior representations, Genentech was able to conflict out many of the
6    other firms who also could competently defend GSK in this case.  Rachlin Decl. at ¶ 4.
7    Thus, Genentech knows that Howrey cannot be replaced without significant prejudice to
8    its client, GSK.

9          **D.     Genentech Has Not Shown That It Is Entitled to an Order Precluding**
10                **GSK from Using Howrey's Work Product.**

11   In a single throw-away sentence in the conclusion of its motion, Genentech asks
12   not only that Howrey be disqualified, but also that Howrey and GSK be prevented from
13   transferring Howrey's work product to successor counsel in the event Genentech's
14   motion were granted.  Genentech does not – and cannot – offer a single argument that
15   would justify imposing such an extreme sanction.

16   To obtain this requested relief, Genentech must prove that Howrey's work
17   product is actually tainted by Bunsow's knowledge of confidential information.  There
18   is no presumption that the work is tainted, even when an attorney has been disqualified.
19   *See First Wis. Mortgage Trust v. First Wis. Corp.*, 584 F.2d 201, 208-09 (7th Cir.
20   1978).[12]  *First Wisconsin* "decline[d] to apply the principle which . . . urges that if there
21   is a disqualification there is a per se taint denying the use of work product during the
22   period of disqualification."  *Id.* at 208.  Moreover, as pointed out by a California court,
23   "the penalty of not allowing work product to be available to successor counsel is not a
24

25   [12] Although neither a Ninth Circuit nor California court decision, *First Wisconsin* is a
     seminal case, and one that has been adopted by California courts based on lack of local
26   authority on this point.  *See Actel Corp. v. Quicklogic Corp.*, No. C-94 20050 JW
     (PVT), 1996 U.S. Dist. LEXIS 11815, at *29-30 (N.D. Cal. Apr. 23, 1996) ("The
27   Asbestos case provides no guidance as to the standards for consideration of remedies
     ancillary to a motion for disqualification.  Nor does any other case in the Ninth Circuit.
28   Only [*First Wisconsin*] provides guidance here.").

DM_US:23243193_6

1 │ penalty against the lawyer, but the client." *Cal Pak Delivery v. UPS*, 52 Cal. App. 4th

2 │ 1, 17 (1997) (refusing to prevent disqualified counsel from turning over his work

3 │ product to successor counsel).

4 │      Here, Genentech cites not a scrap of evidence even suggesting that Howrey's

5 │ work product is tainted by information it received from Bunsow.  Accordingly, there is

6 │ no basis to order Howrey's work product sequestered from any potential successor

7 │ counsel.

8 │ **V.   CONCLUSION**

9 │      Because there is no substantial relationship between *Chiron* and the GSK

10 │ litigation, Henry Bunsow is not conflicted.  Moreover, any conflict that may have

11 │ existed would not be imputed to the entire Howrey firm because Howrey established an

12 │ effective ethical screen.  Nor has Bunsow breached any duty of loyalty to his former

13 │ client, Genentech.  Finally, Genentech has produced no evidence to support the drastic

14 │ sanction it requests, *i.e.*, barring potential successor counsel from gaining access to

15 │ Howrey's work product.  Accordingly, GSK respectfully requests that the Court deny

16 │ Defendants' motion in its entirety.

17 │

18 │ Dated:  May 18, 2010               HOWREY LLP

19 │

20 │

21 │                       By:  /s/ Scott B. Garner

22 │                              Scott B. Garner

23 │                         Attorneys for Plaintiffs and Cross-Defendants GLAXO GROUP LIMITED and GLAXOSMITHKLINE LLC

24 │

25 │

26 │

27 │

28 │