UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| GLAXO GROUP LIMITED and GLAXOSMITHKLINE LLC,<br><br>Plaintiffs,<br><br>v.<br><br>GENENTECH, INC., and CITY OF HOPE,<br><br>Defendants.<br><br>GENENTECH, INC., and CITY OF HOPE,<br><br>Counter-Plaintiffs,<br><br>v.<br><br>GLAXO GROUP LIMITED and GLAXOSMITHKLINE LLC,<br><br>Counter-Defendants. | Case No. cv-10-02764 MRP (FMOx)<br><br>**STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW RE: MOTION TO DISQUALIFY COUNSEL FOR PLAINTIFFS**<br><br>Judge:   Hon. Mariana R. Pfaelzer<br>Ctrm:   12 |

By order dated June 15, 2010, the Court granted the motion of Defendants Genentech, Inc., and City of Hope ("Defendants") to disqualify the Howrey firm, counsel for Plaintiffs Glaxo Group Ltd. and GlaxoSmithKline LLC ("GSK"), from representing GSK in this action. The Court further ordered Howrey to refrain from handing over its work product to successor counsel until further order of the Court. The Court directed Defendants to prepare a proposed Statement of Uncontroverted Facts and Conclusions of Law, to be submitted to the Court by June 25, 2010. Plaintiffs objected to Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law. In consideration of Plaintiffs' objections, the Court amends Plaintiffs' Proposed Statement of Uncontroverted Facts and Conclusions of Law.

Now, pursuant to the Court's order and Local Rule 52-3, the following Statement of Uncontroverted Facts and Conclusions of Law proposed by Genentech and amended by the Court, together with the reasons stated in the Court's Order of June 15, 2010, shall constitute the Findings and Conclusions of the Court in support of its Order of Disqualification.

## Statement of Uncontroverted Facts

1. On April 3, 1983, Shmuel Cabilly et al. filed a patent application that issued on March 28, 1989, as U.S. Patent No. 4,816,567 (the "Cabilly I patent").

2. The Cabilly I patent was assigned to Defendants.

3. The Cabilly I patent concerns genetically engineered monoclonal antibodies that can be used for the treatment of cancer, among other things.

4. On February 8, 1984, the predecessor in interest to Chiron Corp. filed a patent application that, with continuation applications filed in 1985, 1986, and 1995, ultimately issued on April 25, 2000, as U.S. Patent No. 6,054,561 (the "Ring patent").

5. The Ring patent concerns monoclonal antibodies for use in cancer treatments, among other things.

6. The initial application for the Ring patent cites Cabilly I as relevant prior art.

7. On June 10, 1988, Shmuel Cabilly et al. filed a patent application that issued on December 18, 2001, as U.S. Patent No. 6,331,415 (the "Cabilly II patent").

8. As a continuation of the Cabilly I patent, the Cabilly II patent shares a specification with the Cabilly I patent.

9. In February 1991, the U.S. Patent and Trademark Office ("PTO") Board of Patent Appeals and Interferences (the "BPAI") declared a patent interference between the pending Cabilly II application and U.S. Patent No. 4,816,397 (the "Boss patent"), owned by Celltech Therapeutics Ltd. ("Celltech"). Defendants copied claims from the Boss patent, as is standard practice, to initiate the proceeding to determine whether the Boss inventors or the Cabilly inventors were entitled to priority for the inventions claimed in the respective patent and patent application.

10. In August 1998, the BPAI found that the Boss inventors were entitled to priority over the Cabilly inventors.

11. In October 1998, Defendant Genentech Inc. ("Genentech") filed an action pursuant to 35 U.S.C. § 146 against Celltech to appeal the BPAI decision awarding priority to the Boss patent (the "Celltech case").

12. On June 7, 2000, Chiron Corp. filed an action against Genentech alleging that Genentech's breast cancer treatment, Herceptin, infringed the Ring patent (the "Chiron case").

13. Genentech retained the law firm of Keker & Van Nest LLP (the "Keker firm") to defend it in the Chiron case.

14. Attorney Henry C. Bunsow is a member of the State Bar of California. Bunsow, then a partner at the Keker firm, was a lead attorney for Genentech in the Chiron case.

15. Bunsow's role in the Chiron case put him in a direct and personal confidential relationship with Genentech.

16. One of Genentech's principal defenses in the Chiron case was that the Ring patent was invalid and unenforceable for failing adequately to enable or describe recombinant antibodies as claimed.

17. Prior to trial in the Chiron case, Bunsow defended the depositions of Sean Johnston, Genentech's current general counsel, and Wendy Lee, who prosecuted the Cabilly II patent and whom GSK has identified as an important witness in this case.

18. In March 2001, Genentech and Celltech entered into a confidential settlement agreement in the Celltech case. Pursuant to the agreement, the court ordered the PTO to vacate its BPAI decision in the interference case, revoke the Boss patent, and grant the Cabilly II patent.

19. On June 24, 2002, the district court in the Chiron case denied the parties' cross-motions for summary judgment on the issues of whether the pre-1995 applications for the Ring patent enabled or adequately described recombinant antibodies. In its summary judgment order, the court declared that the Cabilly I patent disclosed chimeric antibodies in 1983. *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1148, 1157 (E.D. Cal. 2002).

20. A jury trial in the Chiron case took place in August and September of 2002.

21. Whether the pre-1995 applications for the Ring patent enabled and adequately described recombinant antibodies were the central issues at trial in the Chiron case.

22. Bunsow and his colleagues at the Keker firm pursued a defense strategy relying in part on the specification of the Cabilly I patent, which makes reference to recombinant antibodies.

23. On August 7, 2002, Bunsow examined expert witness Gerald Bjorge and elicited testimony that the pre-1995 Ring patent specification did not describe recombinant antibodies.

24. On August 8, 2002, Bunsow's colleague Daralyn Durie examined expert witness Deborah French about the Cabilly I patent and the Ring patent. Dr. French testified that the Cabilly I patent described how to make recombinant antibodies. Dr. French then testified that the pre-1995 Ring patent specification, unlike the Cabilly I specification, said nothing about recombinant antibodies. Immediately following Dr. French's testimony, Bunsow reemphasized in argument to the jury that Bjorge had also testified that the pre-1995 Ring patent specification did not address recombinant antibodies.

25. On August 9, 2002, Bunsow examined expert witness Axel Ullrich, the principal researcher on Genentech's product, Herceptin. In a colloquy with the Court, Bunsow stated that Dr. Ullrich's testimony was directly relevant to the written description and enablement issues in the Chiron case.

26. Bunsow had access to confidential information from Genentech about Genentech's patent strategy surrounding the Cabilly I and Cabilly II patents.

27. Because the Chiron case and the Celltech case were being simultaneously litigated, Bunsow and his colleagues can be presumed to have had access to confidential information regarding the Cabilly II patent and Genentech's strategy in the Celltech case.

28. On or about September 30, 2002, after the end of trial in the Chiron case, Bunsow left the Keker firm and joined the Howrey firm.

29. In the present case, GSK seeks a declaratory judgment that the Cabilly II patent is invalid for lack of enablement and adequate written description, unenforceable, and not infringed by the manufacture, use, sale, offer to sell, or importation of GSK's Arzerra antibody product. Arzerra is a human monoclonal antibody that was approved by the U.S. Food and Drug Administration for the treatment of chronic lymphocytic leukemia patients.

30. Genentech has stated that it intends to rely on the success of Herceptin, the product at issue in the Chiron case, in the present case to prove the non-obviousness of the Cabilly II patent.

31. GSK was previously represented in related litigation filed in GSK in the Southern District of Florida by a law firm other than Howrey.

32. On or about January 27, 2010, the Howrey firm began to represent GSK as counsel in this case.

33. Neither Bunsow nor the Howrey firm obtained consent from Genentech to accept the representation of GSK in this case.

34. On or about March 11, 2010, after being notified by Defendants of the potential conflict, Howrey imposed an ethical screen walling Bunsow from the Genentech/GSK litigation.

### Conclusions of Law

1. Attorneys appearing in this Court must comply with "the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto." Central Dist. L. R. 83-3.1.2.

2. Absent a written waiver from the client or former client, an attorney must not "accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the [attorney] has

obtained confidential information material to the employment." Cal. R. Prof'l Conduct 3-310(E).

3. A former client who seeks to disqualify counsel from representing an adverse party in a later case must "demonstrate a 'substantial relationship' between the subjects of the antecedent and current representations." *Flatt v. Superior Court*, 9 Cal. 4th 275, 283 (1994).

4. Successive representations are substantially related when information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues. *Jessen v. Hartford Casualty Ins. Co.*, 111 Cal. App. 4th 698, 713 (2003).

5. In order to pursue Genentech's defenses of lack of written description and non-enablement in the Chiron case, and elicit related testimony, an attorney would have needed a detailed understanding of the Cabilly I patent and its specification.

6. Because the Cabilly I patent and the Cabilly II patent share the same specification and are owned by Genentech, an attorney representing Genentech in litigation involving either patent would have had reason to understand both the Cabilly I and Cabilly II patents.

7. It would have been important to Genentech that the defense strategy in the Chiron case would not impair Genentech's ability to enforce and defend the Cabilly II patent.

8. Because the disclosure of the Cabilly I patent was used in support of Genentech's defenses of lack of written description and non-enablement in the Chiron case, because the Cabilly I patent and the Cabilly II patent share the same specification, and because the written description and enablement of the Cabilly II

patent are at issue in the present case, there is a substantial relationship between the Chiron case and the present case.

9. Where a substantial relationship between the subjects of two representations exists, and the attorney's relationship with the client in the first representation was direct and personal, the attorney's possession of confidential information material to the subsequent representation is conclusively presumed. *Jessen*, 111 Cal. App. 4th at 710–11.

10. Because Bunsow is conclusively presumed to have obtained confidential information from Genentech in the Chiron case that is material to this case, Bunsow's representation of adverse party GSK in this case would violate California Rule of Professional Conduct 3-310(E).

11. For violation of California Rule of Professional Conduct 3-310(E) based on a successive representation, disqualification of an attorney's representation of the second client is mandatory. *Flatt*, 9 Cal. 4th at 283.

12. When an attorney is disqualified from a representation under California Rule of Professional Conduct 3-310(E), the disqualification extends vicariously to the attorney's law firm. *Id.*

13. The California Supreme Court does not recognize an exception to vicarious disqualification of the attorney's law firm based on screening of a disqualified lawyer from the attorneys at the firm representing the adverse party. If such an exception existed, it would not apply here because the ethical screen of Bunsow, which was put in place weeks after the representation commenced, was not timely imposed and therefore inadequate.

14. The Howrey firm is therefore disqualified from representing GSK in this matter.

The Howrey firm shall not transfer any work product to GSK or successor counsel until further order of the Court. The Howrey firm is disqualified based on

1  a presumption that it possesses confidential information from Genentech that is
2  material to this case. This presumption also supports a prohibition of transfer of
3  the Howrey's firm's work product to successor counsel. *See EZ Paintr Corp. v.*
4  *Padco, Inc.*, 746 F.2d 1459, 1463 (Fed. Cir. 1984).

6  **IT IS HEREBY ORDERED** that Defendants' Statement of Uncontroverted
7  Facts and Conclusions of Law re: Motion to Disqualify Counsel for Plaintiffs is
8  hereby **ADOPTED** as modified herein by the Court. Plaintiffs' Objections to
9  Defendants' Proposed Statement of Uncontroverted Facts and Conclusions of Law
10 are **OVERRULED IN PART** and **SUSTAINED IN PART**. This Statement of
11 Uncontroverted Facts and Conclusions of Law, together with the Court's Order of
12 June 15, 2010, shall constitute the Findings and Conclusions of the Court in
13 support of its Order of Disqualification.

15 **IT IS SO ORDERED.**

19 Dated: July 13, 2010     _____
                              Honorable Mariana R. Pfaelzer
                              United States District Court Judge